UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

CHASE BANK USA, N.A.,

                    Plaintiff,              09 Civ. 9795

   -against-                         <u>OPINION</u>

UNIFUND PORTFOLIO A LLC,

                    Defendant.

------------------------------------X

A P P E A R A N C E S:

          <u>Attorneys for Plaintiff</u>

          STAGG, TERENZI, CONFUSIONE & WABNIK, LLP
          401 Franklin Avenue, Suite 300
          Garden City, New York  11530
          By:  Thomas E. Stagg, Esq.


          <u>Attorneys for Defendant</u>

          ZUKERMAN GORE BRANDEIS & CROSSMAN, LLP
          875 Third Avenue
          New York, NY  10022
          By:  John K. Crossman, Esq.
               Edward L. Powers, Esq.

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9-13-10
```

**Sweet, D.J.**


The defendant Unifund Portfolio A LLC ("Unifund" or the "Defendant") has moved pursuant to Rule 12(b)6, Fed. R. Civ. P. to dismiss the amended complaint of the plaintiff Chase Bank USA, N.A. ("Chase" or the "Plaintiff"). Based on the conclusions set forth below the motion is denied in part and granted in part, and the amended complaint is dismissed.


This action arises from a 28-page Credit Card Account Purchase Agreement between the parties dated as of January 1, 2008 (the "Agreement") and the accounts offered by Chase in July 2008. Unifund chose not to purchase that batch of accounts. In response, Chase cancelled the Agreement. Despite the work of careful and able counsel, these sophisticated parties now disagree as to the meaning and effect of the Agreement, one of a series negotiated over a period of six years. Chase seeks to recover $11 million, and Unifund seeks costs and counsel fees resulting from its defense.


**Prior Proceedings**


1

On November 25, 2009, Chase filed its original
complaint in this action.  Unifund timely moved to dismiss
pursuant to Rule 12(b)(6).  Rather than oppose the motion, Chase
served and filed its Amended Complaint ("AC"), seeking $11
million in damages.  The instant motion was heard and marked
fully submitted on June 9, 2010.

**The Amended Complaint ("AC")**

Chase was and is a national banking association,
federally chartered and existing under the laws of the United
States, with its main office in the State of Delaware.  (AC ¶
1).  Unifund was and is a limited liability company organized
under the laws of Ohio, with a principal place of business at
10625 Techwood Circle, Cincinnati, Ohio.  (AC ¶ 2).

Chase operates MasterCard and Visa credit card
programs, which may include revolving credit products other than
credit cards, pursuant to which accounts are established or
maintained for cardholders.  When a customer is delinquent on a
credit card account, Chase attempts to collect on the debt,
first internally, and then after charge-off, through outside
agencies.  Typically, if collection is unsuccessful by third-

2

party collectors, Chase will sell it to a debt purchaser, such as Unifund.  (AC ¶ 5).

Most sales of charged-off debt occur in large pools. Some of these pools are sold pursuant to long-term contracts, called "forward-flow" contracts.  Forward-flow contracts are attractive to buyers because they provide a reliable supply of a company's debt pool and are attractive to sellers because they provide a reliable way to remove debt from their books.  (AC ¶ 6).  The pool of charged-off debt sold in a forward-flow contract sells at a steep discount to its face value, usually for cents on the dollar because the accounts are charged-off. The accounts that are collected usually require some expenditure of costs.  (AC ¶ 7).

Prior to purchasing charged-off accounts, a buyer such as Unifund must ascertain whether the price of the debt will allow it to make a profit, taking into consideration factors such as who the issuer is, the geographic distribution of the accounts, the laws of the states where the accounts are located, the terms and conditions of the particular debtor accounts, how old the accounts are, and how recently payments were made and how many payments were made on an account.  (AC ¶ 8).

3

Over the past six years, Chase and Unifund have
negotiated and entered into various contracts for the sale of
charged-off credit card accounts to Unifund.  The contracts were
customarily twelve months in duration, at a set price, with
eligible charged-off accounts presented by Chase to Unifund on a
monthly basis.  (AC ¶ 9).

Pursuant to these contracts, an account was defined as
"ineligible" if the:  (i) cardholder filed or became subject to
bankruptcy proceedings; (ii) cardholder asserted the account or
any transaction on the account was fraudulently originated;
(iii) statute of limitations elapsed; (iv) cardholder died; (v)
account was subject to litigation or class action; or (vi)
account was settled.  (AC ¶ 10).

The AC also contained allegations with respect to
prior contracts of covering similar accounts. (AC ¶¶ 12-47).

On or about January 1, 2008, Chase and Unifund entered
into the Agreement through a contract entitled "Tertiary Recall
Forward Flow" for the sale by Chase of eligible quaternary

4

charged-off accounts to Unifund (AC ¶ 48) which was governed by
the laws of Delaware (AC ¶ 49).

Section 2(b) of the Agreement provides:  "Seller will
sell, assign and transfer to Purchaser and Purchaser shall
purchase all of Seller's rights, title and interest in and to
eligible Charged-off Accounts (which Accounts shall be listed
either on diskette or a spreadsheet to be provided to Purchaser)
at a Purchase Price determined by multiplying the total Unpaid
Balances of the Charged-off Accounts as of the File Creation
Date being sold by five and ninety hundredths percent (5.90%)...
For any Enhanced Digitized Media Accounts, the Purchase Price
for such Enhance Digitized Media Accounts shall be increased by
20 hundredths percent and, as such, shall be determined by
multiplying the total Unpaid Balances of the charged-off Enhance
Digitized Media Accounts being sold by six and ten hundredths
percent (6.10%)."  (AC ¶ 50).  Unifund's Purchase Price was 6.1%
under the terms of the Agreement because at all relevant times
it purchased Enhanced Digitized Media Accounts.  (AC ¶ 51).

Paragraph 2(c) of the Agreement provides that "Seller,
in its sole judgment and subject to the provisions hereof shall

5

determine which Charge-off Accounts shall be eligible for sale to Purchaser hereunder."  (AC ¶ 52).

Paragraph 4(f) of the Agreement provides that "Purchaser is a sophisticated Purchaser that is in the business of buying or collecting Accounts of the type being purchased or otherwise deals in the collection of consumer debt in the ordinary course of Purchaser's business."  (AC ¶ 53).

Paragraph 20 of the Agreement contains a survival clause that expressly provides that ¶ 2 of the contract, entitled Sale of Accounts, survives termination of the contract, along with paragraphs 3 through 10, 12 through 17, 19, 20, 23, and 25 through 29.  (AC ¶ 54).  The Agreement was expected to generate approximately $108,000,000 in revenue for Chase.  (AC ¶ 55).

In or about March 2008, pricing in the post-secondary market for charged-off accounts declined by as much as 30-50% from the fourth quarter of 2007.  (AC ¶ 56).

In or about March 2008, significant supply of charged-off accounts flooded the market in response to tightened credit

6

and large banking institutions being pressured by shareholders to unload bad debt. Virtually overnight, an industry that historically favored issuers of charged-off debt suddenly became a buyer's market. (AC ¶ 57). Realizing the market turmoil, Unifund sought to exploit the destabilized environment by attempting to renegotiate the terms of the Agreement. (AC ¶ 58).

In or about March 2008, Unifund asked that Chase reduce the purchase price set forth in section 2(b) of the 2008 Contract. Unifund submitted two separate proposals for Chase's consideration, each a departure from Unifund's contractual obligations under the Agreement. (AC ¶ 59).

From March through July the parties discussed altering the terms of the Agreement. (AC ¶ 59).

By email dated July 25, 2008, Unifund informed Chase it was not purchasing any charged-off accounts for the July 2008 billing cycle. (AC ¶ 79).

By letter dated July 29, 2008, Chase declared Unifund in breach of the Agreement. (AC ¶ 80). By letter dated August

7

4, 2008, Chase cancelled the Agreement pursuant to section 21, which provides: "Seller may cancel this Contract upon five (5) days prior written notice to Purchaser if (i) Purchaser fails or refuses to purchase any Charged-off Accounts offered for sale hereunder to Purchaser by Seller . . . or (v) Purchaser breaches any other term or condition herein and fails to cure such breach with[in] five (5) days of receipt of Chase's notice of such breach." In the letter, Chase reserved its right to seek damages due to Unifund's failure to purchase the charged-off accounts. (AC ¶ 81).

In an effort to mitigate its damages following Unifund's unilateral failure to honor its contractual obligations, Chase entered into contracts with two other companies to sell the charged-off accounts. However, Chase was unable to sell the charged-off accounts at the purchase price set forth in the Agreement, which resulted in Chase selling the charged-off accounts for less than what it would have sold them to Unifund under the terms the Agreement. (AC ¶ 82). As a result of the foregoing, Chase incurred damaged of no less than $11,024,872.37. (AC ¶ 83).

8

The AC alleged three causes of action (1) a breach of contract (AC ¶¶ 85-89), (2) a breach of implied covenant of good faith and false dealing (AC ¶¶ 90-96), (3) bad faith (AC ¶ 97-101).

## The 12(b) Standard

On a motion to dismiss pursuant to Rule 12, all factual allegations are accepted as true, and all inferences are drawn in favor of the pleader. Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir.1993). The issue "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir.1995) (quoting Scheuer v. Rhodes, 416 U.S. 232, 235-36 (1974)).

Though the pleading standard set forth in Rule 8 of the Fed.R.Civ.P. is a liberal one, it is not without its demands:

> [T]he pleading standard Rule 8 announces ...
> demands more than an unadorned, the-
> defendant-unlawfully-harmed-me accusation. A
> pleading that offers labels and conclusion
> or a formulaic recitation of the elements of
> a cause of action will not do. Nor does a

9

> complaint suffice if it tenders naked
> assertions devoid of further factual
> enhancement.

Ashcroft v. Iqbal, --- U.S. ----, 129 S.Ct. 1937, 1949 (2009)

(internal cites and quotes omitted).  Thus, a complaint must

allege sufficient factual matter to "state a claim to relief

that is plausible on its face."  Id. (quoting Bell Atl. Corp. v.

Twombly, 550 U.S. 544, 570 (2007)).


     In meeting this "plausibility standard," the plaintiff

must demonstrate more than a "sheer possibility" of unlawful

action; pleading facts that are "'merely consistent with' a

defendant's liability ... 'stops short of the line between

possibility and plausibility of entitlement to relief.'"  Id.

(quoting Twombly, 550 U.S. at 557); see also Reddington v.

Staten Island Univ. Hosp., 511 F.3d 126, 131 (2d Cir.2007)

("Although the pleading standard is a liberal one, bald

assertions and conclusions of law will not suffice.  To survive

dismissal, the plaintiff must provide the grounds upon which his

claim rests through factual allegations sufficient to raise a

right to relief above the speculative level."  (internal quotes

and cites omitted)); Gavish v. Revlon, Inc., No. 00-CV-7291,

2004 WL 2210269 at *10 (S.D.N.Y. Sept. 30, 2004) ("[B]ald

contentions, unsupported characterizations, and legal

conclusions are not well-pleaded allegations and will not defeat a motion to dismiss.").

The Court is not limited to the four corners of the complaint, but may consider outside documents which are integral to it regardless of whether attached to the complaint, so long as the pleader has notice of them or refers to them. See Schnall v. Marine Midland Bank, 225 F.3d 263, 266 (2d Cir. 2000). "[W]hile courts generally do not consider matters outside the pleadings, they may consider documents attached to the pleadings, documents referenced in the pleadings, or documents that are integral to the pleadings in order to determine if a complaint should survive a 12(b)(6) motion." Garcia v. Lewis, 2005 WL 1423253 at *10 (S.D.N.Y. June 16, 2005).

**The Motion To Dismiss The Breach Of Contract Claim Is Denied**

The parties each assert the clarity of the Agreement, but reach opposing conclusions. According to Chase, Unifund was required to purchase the eligible charged-off accounts offered by Chase. (Memo in Opp. p. 9-11). According to Unifund, it was

11

entitled under the Agreement to reject the accounts.   (Memo in
Support, p. 6-9).


Chase relies on the mandatory language of Section 2(b)
("Purchaser shall purchase").  Unifund relies on Section 2(f)
and 2(e) which provide that account information shall be used
for no other purpose "other than for determining whether
Purchaser shall purchase the Accounts" and that the information
provided for "Accounts not purchased by Purchaser" shall be
destroyed.  Unifund also notes Section 21(a) which permits Chase
to cancel if Unifund refuses to purchase.


Under Delaware law, if the terms of a contract are
reasonably susceptible to different interpretations or may have
two or more different meanings, the contract is ambiguous.
Seidensticker v. Gasparilla Inn, Inc., Civ. No. 2555-CC, 2007 WL
1930428 at *3 (Del. Ch. June 19, 2007); Concord Mall, LLC v.
Best Buy Stores, L.P., No. Civ.A. 02C-09-267 PLA, 2004 WL
1588248 at *3 (Del. Super. Ct. July 12, 2004).  If a contract is
deemed ambiguous, it is "improper to grant a motion for judgment
on the pleadings because to do so would resolve the ambiguity on
an incomplete record not shaped by discovery." Cypress Assocs.,
LLC v. Sunnyside Cogeneration Assocs. Project, No. Civ. A. 1607-

12

N, 2007 WL 148754 at *3 (Del. Ch. Jan. 17, 2007).  Moreover, on
a motion to dismiss for failure to state a claim, a court may
not choose between two differing reasonable interpretations of
an ambiguous contract unless only one reasonable construction
exists as a matter of law.  Vanderbilt Income & Growth Assocs.,
L.L.C. v. Arvida/JMB Managers, Inc., 691 A.2d 609, 613 (Del.
1996) (citing Barsky v. Flaherty, 1987 WL 17047 (Del. Ch. Sept.
9, 1987).

         The differing interpretations of the Agreement are
facially reasonable, thereby creating an ambiguity.

         When a court is faced with a contractual ambiguity,
the court may consider evidence "including the overt statements
and acts of the parties, the business context, the parties'
prior dealings, and industry custom." Julian v. Julian, Civ.
No. 1892-VCP, 2010 WL 1068192 at *5 (Del. Ch. Mar. 22, 2010)
(quoting Wilm. Firefighters Ass'n, Local 1590 v. City of Wilm.,
No. Civ.A. 19035, 2002 WL 418032 at *10-11 (Del. Ch. Mar. 12,
2002)).  Here, the case is in the early stages of litigation and
Unifund's motion to dismiss is denied to the extent that issues
of fact exist as to the meaning of the Agreement.

                              13

**The Motion To Dismiss The Implied Covenant And Bad Faith Claims Is Granted**

Under Delaware law, an implied covenant of good faith claim is "best understood as a way of implying terms in the agreement, whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions." Twin Bridges Ltd. P'ship v. Draper, No. Civ.A. 2351-VCP, 2007 WL 2744609 at *16 (Del. Ch. Sept. 14, 2007) (quoting Dunlap v. State Farm Fire & Cas. Co., 878 A.2d 434, 442 (Del. 2005)). The AC, however, does not allege any "unanticipated development" nor any "gaps" in the Agreement's provisions. As the Delaware Chancery Court has observed: "Consistent with its narrow purpose, the implied covenant [of good faith] is only rarely invoked successfully." Kuroda v. SPJS Holdings, LLC, 971 A.2d 872, 888 (Del. Ch. 2009); see also Superior Vision Servs., Inc. v. Relia-Star Life Ins. Co., No. Civ.A. 1668-N, 2006 WL 2421426 at *6 (Del. Ch. Aug. 25, 2006) ("[I]mposing an obligation on a contracting party through the covenant of good faith and fair dealing is a cautious enterprise and instances should be rare.").

"Existing contract terms control . . . such that implied good faith cannot be used to circumvent the parties'

14

bargain, or to create a free floating duty . . . unattached to
the underlying legal document." Dunlap, 878 A.2d at 441
(internal quotation marks and citations omitted).  "Thus, one
generally cannot base a claim for breach of the implied covenant
on conduct authorized by the terms of the agreement."  Id.
(citing In re Prudential Ins. Co. of Am. Sales Practices Litig.,
975 F.Supp. 584, 616 (D.N.J. 1996)).  Here, the issue of any
implied covenant will be controlled by any resolution of the
meaning of the Agreement.

        Delaware does not appear to recognize a claim alleging
"bad faith" (other than in the insurance coverage area) as
anything different from the breach of the implied covenant of
good faith inherent in every contract:  "[T]here is no
meaningful difference between 'a lack of good faith' and 'bad
faith.'  Accordingly, to prove a breach of the implied covenant
plaintiff must demonstrate that defendants acted in 'bad
faith.'"  Amirsaleh v. Bd. of Trade of the City of New York,
Inc., Civ. No. 2322-CC, 2009 WL 3756700 at *5 (Del. Ch. Nov. 9,
2009).

        Even assuming "bad faith" existed as an independent
claim for relief in Delaware, the AC makes no allegations to

15

support a separate claim.  Chase repeats and realleges its prior allegations, avers that Chase performed the Agreement (AC ¶¶ 90, 99), and asserts that Unifund acted in bad faith by "failing to make reasonable efforts to meets its obligations under the [Agreement]."  (AC ¶ 100).  In other words, Chase's so-called bad faith claim is wholly dependent upon Chase's breach of contract claim.

The Delaware decisions cited by Chase address conduct that was not expressly covered by the parties' agreements (unlike here).  In BAE Sys. Info. Elec. Sys. Integration, Inc. v. Lockheed Martin Corp., Civ.A. No. 3099-VCN, 2009 WL 264088 at *6 (Del. Ch. Feb. 3, 2009), the court found that where the parties expressly agreed to give plaintiff a "right to bid" on certain business opportunities, implicit (but not addressed) in their agreement was defendant's obligation to provide notice to plaintiff of such opportunities.  In Dunlap, the court dismissed, without prejudice, the implied covenant claim in an action involving the scope of an insurer's duty to process and pay claims.  878 A.2d at 437.

The two decisions Chase cites do not support its so called "bad faith" claim here.  In Int'l Fidelity Ins. v.

16

Delmarva Sys. Corp., No. 99C-10-065 WCC, 2001 WL 541469 (Del. Super. Ct. May 9, 2001), the Delaware Superior Court permitted the assertion of a bad faith claim in the context of a surety agreement, which the court found to be sufficiently similar to an insurance agreement to permit the bad faith claim to go forward. Id. at *10. And, in Ariba, Inc. v. Elec. Data Sys. Corp., No. Civ.A. 02C-06-083JRJ, 2003 WL 943249 (Del. Sup. Ct. Mar. 7, 2003), the Delaware Superior Court declined to dismiss a bad faith claim at the pleading stage because it was unclear whether the claim was being asserted in contract or in tort. Id. at *7-8. Here, Chase concedes that its claim is "rooted in its breach of contract" claim. (Opp. Mem. at 28.)

Therefore, the motion to dismiss the claims for breach of the implied covenant of good faith and for bad faith is granted.

**The Motion To Dismiss The Claim For Damages Is Granted**

Section 29 of the Agreement, entitled "Limitation of Liability," states in relevant part:

Except for each party's obligations under Section 8 (Indemnification) and Purchaser's obligations with

17

respect to Seller's confidential information, in no
event shall either party hereto . . . be liable for
any indirect, incidental, special, punitive or
consequential damages, or for any damages for lost
data, business interruption, lost profits, lost
revenue or lost business arising out of or in
connection with this Agreement, regardless of whether
such damages could have been foreseen or prevented by
either party hereto or whether such party has been
advised of the possibility of such damages.

Agreement, § 29.


Chase has alleged $11 million in damages for breach of

the Agreement representing the difference between the revenue

Chase would have received under the Agreement, presumably for

the remainder of its term (July – December 2008), and the

revenue Chase actually received by selling its charged-off

accounts to third parties.  (AC ¶ 82.)  This is thereby a claim

for lost revenues or lost profits for the remaining term of the

Agreement.  See Crowell Corp. v. Himont, USA, Inc., Civ.A. No.

86C-11-125, 1994 WL 762663 at *3 (Del. Super. Dec. 8, 1994)

(defining "lost profits" as "those profits which might have been

made pursuant to the performance of the particular contract sued

on, during the period for which the contract was to run")

(citing Tanner v. Exxon Corp., No. 79C-JA-5, 1981 WL 191389 at

*3 (Del. Super. July 23, 1981).

Chase exercised its right to cancel the Agreement in August 2008 after Unifund notified Chase that, pursuant to the Agreement, Unifund had determined not to purchase the charged-off accounts offered for sale by Chase in the "current [July] billing cycle."  Chase was not obligated to cancel the Agreement, but once it exercised its remedy, the Agreement was at an end.  Unifund was no longer obligated to perform under the terminated Agreement.  As discussed above, any damages claimed by Chase for the period after it cancelled the Agreement would be, by definition, Chase's lost profits or lost revenues, the very damages the parties barred by their Agreement.  See, e.g., Crowell, supra; Tanner, 1981 WL 191389 at *3 (damages for breach based upon profits that might have been made during the contractual period are lost profits) (citing Chrysler Corp. v. Quimby, 144 A.2d 123 (Del. 1958)).

Chase has sought to avoid the limitation of liability provision, Section 29, claiming that it "fails its essential purpose."  (Opp. Mem. at 23.)

Under Delaware law, liability limitation clauses that preclude various types of damages, including lost profits, are proper and enforceable.  See Delmarva Power & Light Co. v. ABB

19

Power T&D, No. Civ.A. 00C-02-175 WCC, 2002 WL 840564 at *8 (Del.
Super. Ct. Apr. 30, 2002) (holding contract had a valid and
enforceable limited remedy provision that precluded plaintiff
from seeking consequential damages); Eisenmann Corp. v. General
Motors Corp., No. Civ.A. 99C-07-260-WTQ, 2000 WL 140781 at *22
(Del. Super. Ct. Jan. 28, 2000) (barring recovery of lost
opportunity costs where contract contained express provision
barring consequential damages and/or lost profits); Yellow Book
USA v. Sullivan, No. Civ.A. 1999-02-046, 2003 WL 1848650 at *7
(Del. Comm. Pl. Feb. 20, 2003) (barring evidence of lost profits
due to a limitation of liability clause and finding clause
enforceable because "it is within the parties' contractual
intent").

   The primary case Chase cites, J.A. Jones Constr. Co.
v. City of Dover, 372 A.2d 540 (Del. Super. Ct. 1977), involved,
among other things, the interpretation of warrant/limitation of
liability clauses in contracts for the sale of electric
generation equipment.  Id. at 547-554.  As the contracts
involved the sale of goods, they were subject to Article 2 of
the Delaware Uniform Commercial Code and that law's specific
restraints on contractual limitations of liability.  Id. at 549.

20

One party to a contract cannot by its unreasonable conduct defeat the other party's remedy expressly set forth in the contract, and then seek to avoid responsibility under a limitation of liability clause.  Thus, in Jones, the seller of defective goods could not defeat the warranty remedy in a sales contract (under which it agreed to repair or replace a defective product) by delaying the repair or replacement to the point of injuring the buyer, and then invoke the contract's limitation of liability provision.  Id. at 551-2.

Assuming arguendo that the failure to sell or purchase constituted a breach, Section 21 of the Agreement provides the cancellation remedy that Chase utilized.  Section 29 of the Agreement does not defeat this remedy; it merely limits recoverable damages.  Under Section 29's preclusion of lost revenues and lost profits, the motion to dismiss the AC is granted.

21

Based on the conclusions set forth above, the motion to dismiss the AC for breach of contract is denied, and the motion to dismiss the claim for damages is granted.  The amended complaint is dismissed.  Unifund is also granted reasonable attorneys' fees and costs under Section 28.

It is so ordered.

**New York, NY**
**September 10 2010**

ROBERT W. SWEET
U.S.D.J.

22